OPINION
{¶ 1} The Non-Employees of Chateau Estates Resident Association and numerous individual residents of the Chateau Estates mobile-home park appeal from the trial court's February 23, 2006, entry disposing of certain post-trial motions.[1]
 {¶ 2} The parties' legal dispute, which began more than five years ago, involves efforts by appellee Chateau Estates, Ltd. to remove elevated levels of iron and arsenic from the water provided to residents of its mobile-home park. This court has reviewed various aspects of the case on numerous occasions.[2]We have detailed the factual background of the dispute in our earlier rulings and need not repeat that discussion here. For present purposes, we note that the residents now have a new water-filtration system that allegedly is providing them with potable water. The efficacy of the new system, however, is disputed by the Association.
 {¶ 3} In the first of its two assignments of error, the Association contends the trial court abused its discretion by sua sponte excusing Chateau Estates from a prior court order mandating water-quality testing at ten locations for six months. In its second assignment of error, the Association claims the trial court erred in prematurely releasing all escrowed rent payments to Chateau Estates. The Association argues that the trial court should have retained the remaining escrowed funds in case the new water-filtering system proves to be ineffective and additional relief is required.
 {¶ 4} The Association's first assignment of error stems from several prior orders concerning water-quality testing at the mobile-home park. On November 19, 2003, a magistrate ordered monthly testing of water drawn from the well head and ten residents' lots. (Doc. #265). Thereafter, the trial court filed a December 8, 2003, entry in which it ordered the installation of valves to facilitate testing at the residents' lots. (Doc. #274). On March 31, 2004, the trial court filed another order before the new water-filtration system had been installed. In relevant part, this order provided: "After the system is installed and in operation, water testing, as presently ordered, shall continue to be monitored for six (6) months. At the end of that period, the Court shall schedule a hearing to determine whether further monitoring is needed and if different action is indicated." (Doc. #333 at 2).
 {¶ 5} On appeal, the Association argues that the trial court abused its discretion in its subsequent February 23, 2006, entry by excusing Chateau Estates from complying with the requirement of six months' additional testing after the new water-filtering system was "installed and in operation."
 {¶ 6} Upon review, we find the Association's argument to be unpersuasive. The transcript of a September 30, 2005, status conference reveals that the new water-filtering system was "installed and in operation" shortly before that date. During the status conference, the trial court discussed the operation of the new system with Dr. John Eastman, who was involved in the project. Eastman testified that "[t]he present status of the system is fully online and operating." (Sept. 30, 2005, transcript at 5). The trial court also heard testimony from Eastman about the results of water-sample testing done after the new system became operational. Finally, the trial court made the following order with regard to continued testing:
 {¶ 7} "The Court's gonna order that samples continue to be collected until January 2006. For the month of October, I want the water tested at the well or coming out of the system weekly, just there. And at the trailer's taps, I want them tested October 15 and October 29.
 {¶ 8} "November, at the wellhead I want them checked, tested November 11[,] * * * 10, 11, or 12, one of those days, I want it also tested on November 25th and at the trailers on the 25th. December, at the wellhead, December 9th, December 30th. At the trailers, December 30th. We will set it for a final hearing late in January and Dr. Eastman, you're no longer required to provide any monthly reports[.]" (Id. at 31).
 {¶ 9} Thereafter, the trial court subsequently held the promised January meeting on January 27, 2006. During that meeting, Eastman described the new system as "functional, working and doing what [he] thought it would do[.]" (Jan. 27, 2006, transcript at 18). Eastman added that based on his review of the additional test results since the system became operational it was "performing" and "putting out water that meets all the-not only the original EPA requirements, but the new EPA arsenic requirements and that the, at this point in time all of the test points throughout the distribution system are meeting the standards for arsenic and iron and manganese." (Id.). Eastman then stated: "At this time, all the water for arsenic is below detection limits, which makes it well under the ten micrograms per liter; and for iron, there's a couple values that are detectable but they're way below the standard. And remembering that the standard is actually applied when it leaves the treatment plant. But even that standard applied at the homes, it meets those standards." (Id. at 19).
 {¶ 10} One day before the January 27, 2006, status conference at which Eastman testified, the Association had filed a notice in which it reminded the trial court of its March 31, 2004, order requiring water-quality testing for an additional six months after the installation of the new system. In its notice, the Association took the position that the new system had not become "fully operational" until October 25, 2005.[3] Therefore, it asked the trial court to continue monthly water testing for six months after that date, which would have been late April 2006. (Doc. #532 at 1-2). In the February 23, 2006, entry from which the Association has appealed, however, the trial court actually ordered continued water testing, albeit at a reduced number of locations, through July 2006. (Doc. #540).
 {¶ 11} We find no abuse of discretion in the trial court's most recent order regarding continued testing. As set forth above, the initial order on water-quality testing called for testing at the well head and ten other locations. The trial court subsequently ordered such testing to continue for six months after the new water-filtering system was "installed and in operation." Following that six-month period, the trial court anticipated holding a hearing to determine what additional action, if any, was needed.
 {¶ 12} Based on the testimony cited above, the record persuades us that the new water-filtering system was installed and in operation no later than September 2005. Therefore, under the terms of the trial court's initial testing orders, such testing should have occurred once a month, at the locations indicated, through March 2006. The record contains evidence establishing that such testing did take place at those locations through February 2006. As for March 2006 — the only month remaining in the six-month window covered by the initial testing orders — the trial court's February 23, 2006, entry reduced the number of testing locations from ten mobile homes to two. Insofar as the Association now challenges the trial court's sua sponte modification of its prior testing orders, its complaint necessarily is limited to this one-month reduction in testing locations. This is so because prior to March 2006 the testing occurred at all locations, and after March 2006 the original testing orders did not entitle the Association to any water-quality tests at all.
 {¶ 13} Even if the trial court erred in reducing the number of testing locations for the single month of March 2006,[4]we find its error to be de minimus in the context of the many months of testing that have occurred. During the course of this litigation, Chateau Estates has conducted literally hundreds of water-quality tests. We find no prejudicial error in the trial court's reduction in the number of tests for the single month of March 2006. Moreover, any conceivable prejudice to the Association as a result of the one-month reduction in testing locations is ameliorated by the trial court's further decision in its February 23, 2006, entry to extend the water-testing requirement for an additional four months through July 2006.
 {¶ 14} The bottom line is that the trial court has required water-quality testing for ten months after the new system was installed and in operation, whereas the testing orders at issue here only called for six months of testing. For the first five of the ten months, the trial court required testing at ten mobile homes, as mandated in its original testing orders. For the last five months, the trial court has required the testing monthly at fewer locations with on-going judicial review of the test results. We cannot say the trial court abused its discretion in exercising its oversight in this manner. The Association's first assignment of error is overruled.
 {¶ 15} In its second assignment of error, the Association contends the trial court erred in releasing all remaining escrowed rent payments to Chateau Estates. In particular, the Association argues that the release of the escrowed rent payments constitutes "a denial of justice, contrary to the provisions of ArticleI, Section 16 of the Ohio Constitution."[5]According to the Association, the trial court should have retained the remaining escrowed funds in case the new water-filtering system proves to be ineffective and additional relief is required.
 {¶ 16} Upon review, we find no error in the trial court's release of the escrowed funds. The record reflects that residents of the mobile-home park began depositing their rent payments with the clerk of courts prior to installation of the new water-filtering system, as authorized by R.C. § 3733.12. The purpose of the escrow process was to compel Chateau Estates to supply the residents with potable water.
 {¶ 17} In its February 23, 2006, entry, the trial court found — based on several months of test results through December 2005 and testimony presented in open court on January 27, 2006 — that the mobile-home park's "water is not only potable, but it is also clean." In light of this finding, the trial court sustained Chateau Estates' motion for the release of escrowed rent under R.C. § 3733.122, which provides:
 {¶ 18} "(C) If the court finds * * * that the condition [resulting in the escrow] has been remedied * * * the court shall order the release to the park operator of rent on deposit with the clerk, less costs."
 {¶ 19} On appeal, the Association asserts that the trial court acted prematurely in releasing the escrowed funds. In support, it reasons as follows:
 {¶ 20} "The trial court failed to ensure that Plaintiffs-Appellants will receive a permanent remedy for the water problem that exists at the Park. * * * Defendants-Appellees requested, pursuant to R.C. 3733.122, that the rent held in escrow by the Clerk of Courts be released to Defendants-Appellees for the reason that they had remedied the deficient condition of the water and become compliant with all relevant codes. There is no guarantee, however, that the Defendants-Appellees will remain compliant as the System ages. Monitoring the System for an extended period of time would help insure that the System will in fact provide clean and potable water to the residents of the Park on a continuing basis.
 {¶ 21} "Releasing the monies escrowed, that were held for the purposes of remedying the water problem, undermines the Trial Court's ability to enforce an order requiring Defendants-Appellees to seek an alternative remedy for the water problem should the System fail during the monitoring period. This would constitute a denial of justice contrary to the provisions of the Ohio Constitution." (Appellants' brief at 8).
 {¶ 22} We find the foregoing argument to be unpersuasive. Based on Eastman's testimony and several months of test results, the trial court concluded on February 23, 2006, that Chateau Estates was providing its residents with "clean" and "potable" water. At that point, then, the residents had no legal basis for escrowing their rent, and the trial court properly returned the unused funds pursuant to R.C. § 3733.122(C), which provides that such funds shall be returned once the problem leading to the escrow has been remedied.
 {¶ 23} As for the Association's argument that the new water-filtering system might fail as it ages, such a possibility always will exist. The fact remains, however, that the evidence before the trial court at the time of its ruling supported its conclusion that the new system was an effective remedy and that Chateau Estates was entitled to a refund of remaining escrowed funds.
 {¶ 24} In its reply memorandum, the Association argues that subsequent testing of water samples drawn after the January 27, 2006, hearing revealed the continued presence of arsenic and iron. The Association raised this issue in the trial court through a motion for reconsideration filed on March 7, 2006. (Doc. #542). A week later, however, the Association filed its notice of appeal from the trial court's February 23, 2006, entry discussed above. The trial court proceeded to hold a March 24, 2006, hearing on the motion for reconsideration but declined to make any new orders pending our resolution of this appeal.
 {¶ 25} During the March 24, 2006, hearing, Eastman again testified and discussed the new test results. He reaffirmed his belief that the water-filtering system at the park's treatment plant was working properly and providing residents with clean water. Eastman did acknowledge, however, that a couple of test results for water samples drawn on January 31, 2006, showed somewhat elevated levels of arsenic and/or iron. He stated that there was a "very simple explanation" for the results, which suggested pockets of residual iron and arsenic in the distribution pipes coming loose and showing up at relatively low levels in water drawn from the residents' lots. (March 24, 2006, trial transcript at 9). Although the levels in a couple of the tests were higher than desired, Eastman opined that they were "not a big deal." (Id. at 15). He also testified that the subsequent test results from February 2006 again were within acceptable limits. (Id. at 10, 12). According to Eastman, "[t]he results are clearly indicating overall a significant decline in the levels when you, instead of looking at just a couple results isolation, when you look at the whole picture overall, the system is clearly being cleansed of residual iron and therefore also residual arsenic." (Id. at 14).
 {¶ 26} Having reviewed the new evidence presented to the trial court at the March 24, 2006, hearing, we conclude that it does not provide us with a basis for reversing the trial court's February 23, 2006, ruling releasing the escrowed funds to Chateau Estates. We reach this conclusion for at least two reasons. First, the undisputed evidence before the trial court at the time of its escrow-release order established that the new water-filtration system was working properly and that the residents were receiving clean water. Therefore, based on the evidence then before it, the trial court properly released the funds pursuant to R.C. § 3733.122. Second, the trial court has not yet made any factual or legal determinations based on the evidence presented at the March 24, 2006, hearing. In light of this appeal, the trial court declined to make any orders. In our view, the trial court should have the initial opportunity to examine the new evidence, along with additional monthly test results that now exist, to determine its significance, or lack thereof, and whether any further action is required. For present purposes, we decline to reverse the trial court's judgment based on evidence that was not available to it at the time of its ruling. To do otherwise would be patently unfair to the trial court. Accordingly, we overrule the Association's second assignment of error.
 {¶ 27} Having overruled both assignments of error, we hereby affirm the judgment of the Clark County Municipal Court.
FAIN, J., concurs.
[1] "The Non-Employees of Chateau Estates Resident Association is an unincorporated association comprised of residents of the mobile-home park. For purposes of our analysis herein, we will refer to the Association and the individual residents collectively as "the Association."
[2] Non-Employees ofChateau Estates Resident Assn. v. Chateau Estates,Ltd., Clark App. No. 2005-CA-109, 2006-Ohio-3742; Non-Employees ofChateau Estates Resident Assn. v. Chateau Estates, Ltd., Clark App. Nos. 2005-CA-02, 2005-CA-05 2005-CA-33, 2005-Ohio-3739; Non-Employees ofChateau Estates Resident Assn. v. Chateau Estates, Ltd., Clark App. Nos. 2004-CA-19 2004-CA-20, 2004-Ohio-3781; Non-Employees of ChateauEstates Resident Assn. v. Chateau Estates, Ltd., Clark App. No. 2002-CA-68, 2003-Ohio-2514.
[3] In support of this position, the Association cited a letter from John Eastman to Jack Duncan, the manager of Chateau Estates, advising that an "additional improvement" to the new water-filtering system would be made in late October 2005.(Doc. #532 at Exh. A).
[4] "Whether the trial court actually erred in reducing the number of testing locations for the month of March 2006 requires some analysis. InNon-Employees of Chateau Estates Resident Assn. v. Chateau Estates, Ltd., Clark App. No. 2002-CA-68, 2003-Ohio-2514, we characterized the monthly water testing as a form of injunctive relief available to the mobile-home park residents. Presumably, this equitable remedy would be in the form of mandatory injunctive relief, insofar as it actually compels action by a private party. See Snelling Snelling, Inc. v.ARICO, Inc. (1993), 83 Ohio App.3d 89, 95. In any event, order granting injunctive relief "is executory and continuing as to the purpose and object to be attained and is always subject to adaptation to changing conditions." City of Newark v. Prince (March 12, 1985), Licking App. No. CA-3084 at *2; see also Dean v. Nugent Canal Yacht Club (June 30, 1993), Ottawa App. No. 92OT048, at *2 (recognizing that an injunction is an equitable remedy which the trial court has the inherent power to modify). Ordinarily, however, modification of injunctive relief occurs only upon the motion of a party. Id. Here there is no evidence that Chateau Estates requested modification of the trial court's original water-testing orders. Therefore, it appears that the trial court should not have reduced the number of testing locations for the month of March 2006.
[5] In relevant part, Article I, Section 16 provides: "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."